IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 14, 2010 Session[1]

**CLARENCE E. JOHNSON**

v.

**TANNER-PECK, L.L.C.; WILLIAM B. TANNER, INDIVIDUALLY AND D/B/A TANNER-PECK OUTDOOR, D/B/A TANNER-PECK, D/B/A TANNER-PECK OUTDOOR ADVERTISING; JERRY W. PECK, INDIVIDUALLY, AND D/B/A TANNER-PECK OUTDOOR, D/B/A TANNER-PECK, D/B/A TANNER-PECK OUTDOOR ADVERTISING; TOA, LIMITED; TOA ENTERPRISES, LP; MARTIN A. GRUSIN, TRUSTEE OF THE WEATHERLY TANNER TRUST; UNIVERSAL OUTDOOR, INC.; WBT OUTDOOR, INC.; TANNER ACQUISITION CORPORATION; AND TANNER OUTDOOR, LLC**

An Appeal from the Chancery Court for Shelby County
No. 109807-2 T.D.     Arnold B. Goldin, Chancellor

_____

**No. W2009-02454-COA-R3-CV - Filed April 8, 2011**

_____

This is the second appeal in this breach of contract case. The plaintiff employee filed this lawsuit against the defendants for breach of an oral employment agreement. The trial court granted summary judgment in favor of the plaintiff and awarded him damages. The defendants filed a motion to revise the summary judgment order and submitted an affidavit in support of the motion. The trial court struck the supporting affidavit and denied the motion to revise. The defendants filed the first appeal. In the first appeal, the trial court's grant of summary judgment, including the award of damages, was affirmed, but the cause was remanded to the trial court for findings on its denial of the motion to revise. On remand, the trial court explained that it struck the affidavit submitted with the motion to revise for lack of personal knowledge and because it violated the Dead Man's Statute. The defendants now appeal the trial court's order denying the motion to revise. We reverse the denial of the motion to revise and remand for a recalculation of damages.

---

[1]After oral argument in this appeal, the appeal was held in abeyance while the case was remanded to the trial court on issues related to whether the Appellants had appealed a final, appealable judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is
Affirmed in Part, Reversed in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J.,
W.S., and DAVID R. FARMER, J., joined.

William Ernest Norcross, Cordova, Tennessee; and Michael R. Flynn, Memphis, Tennessee,
for the Defendants/Appellants Patricia Tanner, executrix for the Estate of William B. Tanner,
and Tanner-Peck, L.L.C., n/k/a Tanner Investment Company[2]

Tim W. Smith, Murfreesboro, Tennessee, for the Plaintiff/Appellee Clarence E. Johnson[3]

**OPINION**

**FACTS AND PROCEEDINGS BELOW**

In 1992, Defendant William B. Tanner ("Mr. Tanner"), now deceased, owned a billboard
business, apparently as a sole proprietorship.[4]  The business was operated under the trade
name "Tanner Outdoor" or "Tanner-Peck Outdoor."  Mr. Tanner was the "Chairman and
Chief Executive Officer" of Tanner Outdoor; his wife, Patricia Tanner ("Mrs. Tanner"), was
the President and the Secretary.  Mr. Tanner's billboard business consisted of ownership and
leases of real property and ownership of personal property with a value in excess of
$1,000,000.

In October 1992, Plaintiff/Appellee Clarence E. Johnson ("Mr. Johnson") was hired by Mr.
Tanner to work as a salesman for Mr. Tanner's billboard business.  The terms of Mr.
Johnson's oral employment agreement included a base salary of $45,000 per year, twelve
percent (12%) commissions on personal sales, two percent (2%) override of net profits, and
an option to purchase up to five percent (5%) of the company.

In November 1994, Defendant/Appellant Tanner-Peck, L.L.C., was organized as a Tennessee
limited liability company.  Mr. Tanner was the Chief Manager of Tanner-Peck, L.L.C., and
Mrs. Tanner was its Secretary.  In January 1995, Mr. Tanner's billboard business was

---

[2]Mr. Flynn did not represent the Defendants/Appellants in the first appeal.

[3]Mr. Smith did not represent Mr. Johnson in the trial court or in the first appeal in this case.

[4]In this Opinion, the recitation of the facts is taken in part from the Court's opinion in the first appeal of this
case, *Johnson v. Tanner-Peck, L.L.C.*, No. W2008-00767-COA-R3-CV, 2009 WL 3064894 (Tenn. Ct. App.
Sept. 25, 2009).

transferred to Tanner-Peck, L.L.C. After that, Mr. Johnson was paid through the limited liability company.

On September 12, 1996, Defendant Universal Outdoor, Inc., and Defendant Tanner Acquisition Corporation, a subsidiary of Universal Outdoor, Inc. (collectively "Universal"), entered into an Option and Asset Purchase Agreement (the "Universal Option Agreement"). Under the Universal Option Agreement, Universal was granted an option to purchase substantially all of the assets comprising Mr. Tanner's billboard business (which included Tanner-Peck, L.L.C., Defendant WBT Outdoor, Inc., and Defendant TOA Enterprises, L.P.) for a purchase price of $70,880,000, plus 100,000 shares of Universal stock. The asset sale contemplated by the Universal Option Agreement closed on January 2, 1997. At the time of the January 2, 1997 closing, the assets comprising Mr. Tanner's billboard business were subject to liens securing approximately $21,000,000 in debt held by First Tennessee Bank. At the January 2, 1997 closing, First Tennessee Bank was paid the amount of the debt from the cash proceeds received from Universal. At the time of the January 2, 1997 closing, Universal shares were trading at $23.0625 per share.

Soon after the Universal closing, on January 13, 1997, Mr. Johnson ended his association with Mr. Tanner. Approximately six months later, on July 28, 1997, Mr. Johnson filed the instant "Complaint for Breach of Contract et al." against Tanner-Peck, L.L.C.; William B. Tanner, individually and d/b/a Tanner-Peck Outdoor, d/b/a Tanner-Peck, d/b/a Tanner-Peck Outdoor Advertising; Jerry W. Peck, individually and d/b/a Tanner-Peck Outdoor, d/b/a Tanner-Peck, d/b/a Tanner-Peck Outdoor Advertising; TOA, Limited; TOA Enterprises, L.P.; Martin A. Grusin, Trustee of The Weatherley Tanner Trust; Universal Outdoor, Inc.; WBT Outdoor, Inc.; Tanner Acquisition Corporation; and Tanner Outdoor, L.L.C. (collectively, "Tanner defendants"). In his complaint, Mr. Johnson asserted that the Tanner defendants owed him a total of $4,355,650, comprised of: (1) unpaid commissions in the amount of $585,200, (2) unpaid profit percentages in the amount of $120,450, and (3) an unpaid 5% ownership interest valued at $3,650,000.

On August 26, 1997, Mr. Tanner filed his answer to Mr. Johnson's complaint, in which he denied that either he, individually, or d/b/a TOA Enterprises, WBT Outdoor, or Tanner-Peck, L.L.C., ever agreed to sell Mr. Johnson any portion of Mr. Tanner's billboard business. In the answer, Mr. Tanner maintained that Mr. Johnson was an at-will employee and had been paid all monies due him. Mr. Tanner also asserted the affirmative defenses that Mr. Johnson's claims were barred by: (1) the applicable statute of limitations, (2) the doctrine of accord and satisfaction, (3) the doctrine of waiver, (4) the doctrine of estoppel, and (5) the applicable statute of frauds.

Tanner-Peck, L.L.C., filed its answer on August 26, 1997, in which it adopted, pursuant to Tennessee Rule of Civil Procedure 10.04, the answers and responses set forth in Mr. Tanner's answer. Tanner-Peck, L.L.C., also adopted the affirmative defenses relied upon by Mr. Tanner. In addition to these affirmative defenses, Tanner-Peck, L.L.C., stated that:

> 51. Tanner-Peck, L.L.C. did not acquire the assets comprising Mr. Tanner's advertising business until on or about January 19, 1995.
> 52. Tanner-Peck, L.L.C. did not assume any of the past due obligations alleged by Johnson as being due to him prior to January 15, 1995.
> 53. Tanner-Peck, L.L.C. only assumed remuneration sums due Johnson, as an at-will employee, after January 19, 1995, and only so long as Johnson's employment continued.

On August 26, 1997, TOA Enterprises, L.P., filed its answer to the complaint. Therein, TOA Enterprises adopted the answers, responses, and affirmative defenses set forth in Mr. Tanner's answer. On the same day, Martin A. Grusin, as Trustee of the Weatherley Tanner Trust, filed a motion to dismiss the complaint against the Weatherley Tanner Trust. Discovery ensued.

For reasons that do not appear in the appellate record, the case remained inactive for roughly seven years, from 1999 until Mr. Tanner died in early December 2005. After Mr. Tanner's death on December 16, 2005, the trial court entered an order granting Mr. Johnson's motion for substitution of the Representative of the Estate of William B. Tanner as a party defendant. Pursuant to this order, Mrs. Tanner, as Executrix of the Estate of William B. Tanner ("the Estate"), was substituted for William B. Tanner as a party defendant. After that, the case suddenly became quite active.

On August 31, 2006, Mr. Johnson filed a motion for summary judgment, along with a supporting statement of undisputed facts and memorandum of law. Mr. Johnson filed several affidavits, including his own, in support of the summary judgment motion. Mr. Johnson's affidavit outlined the course of his dealings with Mr. Tanner, their oral agreement on the terms of Mr. Johnson's employment, and Mr. Tanner's repeated rebuffs of Mr. Johnson's proposals on exercising his option to buy 5% of Mr. Tanner's billboard business.

On April 30, 2007, Mrs. Tanner, as Executrix of Mr. Tanner's Estate, filed a motion to strike Mr. Johnson's affidavit, asserting that portions of the affidavit violated the Dead Man's Statute, Tennessee Code Annotated § 24-1-203 ("Dead Man's Statute"). The defendants filed a joint response in opposition to Mr. Johnson's summary judgment motion, disputing various facts and alleging, among other things, that (1) Johnson's claims are allegedly time barred under Tennessee Code Annotated § 28-3-105(1); (2) Johnson's claims for breach of

contract are barred by the Tennessee Statute of Frauds, Tennessee Code Annotated § 29-2-101; (3) Johnson's alleged oral agreement is indefinite on an essential element and is, therefore, not an enforceable contract; and (4) Johnson, by his acts and conduct, over a period of four years, waived any claim that there was an oral agreement pursuant to which Mr. Tanner agreed to pay Mr. Johnson twelve percent of Mr. Johnson's personal sales and to permit Mr. Johnson to purchase a 5% ownership interest in the assets of Mr. Tanner's billboard business.

In support of the response to Mr. Johnson's summary judgment motion, the Tanner defendants submitted an affidavit by Mrs. Tanner, also filed on April 30, 2007. In the affidavit, Mrs. Tanner stated that she worked daily in the billboard business with Mr. Tanner and, after his death, became the Chief Manager of Tanner-Peck, L.L.C. The affidavit outlined the sequence of transactions that culminated in the 1994 formation of Tanner-Peck, L.L.C., and the 1997 sale of the assets of the billboard business to Universal Outdoor, Inc. Mrs. Tanner's affidavit asserted that Mr. Tanner never agreed that Mr. Johnson could purchase 5% of the billboard company, and claimed that Mr. Johnson had been paid all sums due him.

On June 6, 2007, Mr. Johnson filed a memorandum of law replying to the Tanner defendants' response to the motion for summary judgment. Attached to the reply were affidavits by Karen Gregory, Jerry Peck, Pat McGee, and Sidney Mendelson. In part, these affidavits corroborated Mr. Johnson's assertion that his oral employment agreement with Mr. Tanner included an option to purchase 5% of Mr. Tanner's billboard company.

On October 4, 2007, the trial court held a hearing on Mr. Johnson's motion for summary judgment. On December 13, 2007, the trial court entered an order granting Mr. Johnson's motion. In its order, after reviewing Mr. Johnson's affidavit, the trial court struck the paragraphs in which Mr. Johnson recounted certain statements by Mr. Tanner, finding that these assertions should be excluded under the Dead Man's Statute. It found, however, that similar statements in the other affidavits proffered by Mr. Johnson were not excluded under the Dead Man's Statute because the affiants did not seek to recover against the Estate. As to Mrs. Tanner's affidavit, filed by the Tanner defendants, the trial court found that she did not have personal knowledge of the agreement between Mr. Johnson and Mr. Tanner, and that the paragraph in which she recounted statements by Mr. Tanner was not admissible. It observed that Mrs. Tanner's assertion that Mr. Johnson had been paid all sums he was due was merely a "conclusory statement." For these reasons, the trial court found that Mrs. Tanner's affidavit did not "create a genuine issue of material fact that requires trial." After reviewing the admissible, and now undisputed, evidence, the trial court determined that the terms of the employment agreement between Mr. Johnson and Mr. Tanner included "a base salary of $45,000 per year, a two percent (2%) override of net profit, twelve percent (12%)

commission on personal sales, and an option to purchase five percent (5%) of the company." The trial court ultimately awarded Mr. Johnson $852,000 for unpaid commissions on Mr. Johnson's personal sales, $120,450 in unpaid profit overrides, and $3,383,000 "for not being allowed to exercise his five percent (5%) purchase option." The trial court entered an order granting summary judgment in favor of Mr. Johnson against both the Estate and Tanner-Peck, L.L.C.

On January 11, 2008, the Estate and Tanner-Peck, L.L.C, n/k/a Tanner Investment Company, L.L.C., filed a motion to alter or amend the order granting summary judgment. In the motion, they contended that summary judgment should not have been granted against Tanner-Peck, L.L.C., because Mr. Johnson did not specifically request that summary judgment be granted against that entity, and he did not allege facts indicating that there was any agreement between him and Tanner-Peck, L.L.C. They noted that Tanner-Peck, L.L.C., did not exist in October 1992, when Mr. Johnson and Mr. Tanner entered into the alleged oral employment agreement. Therefore, they claimed the summary judgment order should be amended to reflect summary judgment only against the Estate, not against Tanner-Peck, L.L.C. In the alternative, if Tanner-Peck, L.L.C., were not removed from the summary judgment order, they asserted that the judgment against Tanner-Peck, L.L.C., should be reduced by $279,997.98, the amounts earned by Mr. Johnson in 1993 and 1994, the years before Tanner-Peck, L.L.C. was formed.

In addition, the Estate and Tanner-Peck, L.L.C., asserted in their motion to alter or amend that the judgment against the Estate should be reduced by $907,364. The Tanner defendants claimed that, in calculating Mr. Johnson's damages from not being permitted to purchase 5% of the company, the trial court improperly used the value of the Universal stock as of September 12, 1996 (the date of execution of the Universal Option Agreement), as opposed to the price of the stock on January 2, 1997, the closing date of the sale to Universal, to determine the sales price to Universal. Finally, they claimed that the trial court erred in calculating damages against the Estate, because it awarded Mr. Johnson 5% on the gross sales price of the business, without reducing it by the $21,000,000 debt paid to First Tennessee Bank out of the cash proceeds received from Universal.

In support of the motion to alter or amend, the Tanner defendants filed another affidavit by Mrs. Tanner, dated January 11, 2008. Attached to Mrs. Tanner's affidavit were numerous exhibits relating to the value of the billboard business and the sale to Universal. The affidavit addressed the formation of Tanner-Peck, L.L.C., its financial assets and debts, and the financial details of the sale of the Tanner billboard assets to Universal.

The appellate record does not include a response by Mr. Johnson to the Tanner defendants' motion. There is no indication that Mr. Johnson objected to Mrs. Tanner's January 11, 2008 affidavit or the attached exhibits.

On February 15, 2008, the trial court conducted a hearing in which it struck Mrs. Tanner's January 11, 2008 affidavit and denied the motion to alter or amend. On March 13, 2008, the trial court entered its written order denying the motion to alter or amend. The written order stated that "it is not appropriate for the subsequent January 11, 2008 affidavit of [Mrs. Tanner] and its attachments to be considered as part of the record." *Johnson v. Tanner-Peck, L.L.C.*, No. W2008-00767-COA-R3-CV, 2009 WL 3064894, at *10 (Tenn. Ct. App. Sept. 25, 2009). The trial court then stated: "In all other respects, the Motion to Alter or Amend the Summary Judgment Granted to Plaintiff Clarence Johnson on December 13, 2007 is denied." This order was certified as final pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure. The Estate and Tanner-Peck, L.L.C. (collectively, "Appellants"), appealed the trial court's grant of summary judgment in favor of Mr. Johnson and the denial of their motion to alter or amend.

On September 25, 2009, this Court filed an Opinion in the first appeal. In the first appeal, the trial court's grant of summary judgment in favor of Mr. Johnson was affirmed, based on the Appellants' failure to submit sufficient evidence to rebut the evidence proffered by Mr. Johnson on the agreement between Mr. Johnson and Mr. Tanner. The appellate court agreed with the trial court's holding that the portions of Mr. Johnson's own affidavits relating to conversations he had with Mr. Tanner should be stricken from the record based on the Dead Man's Statute. As did the trial court, the appellate court noted that Mr. Johnson had submitted affidavits from Karen Gregory, Jerry Peck, Pat McGee, and Sidney Mendelson to support his claim that an oral contract with Mr. Tanner existed and to prove the terms of the contract. *Id.* at *6.

The appellate court noted that the Tanner defendants' sole supporting affidavit filed in response to Mr. Johnson's summary judgment motion was the April 2007 affidavit of Mrs. Tanner. It observed that most of the information in Mrs. Tanner's April 2007 affidavit related to the reorganization of Mr. Tanner's billboard business, and that the facts related to the reorganization were not in dispute. *Id.* at *7. The appellate court noted, however, that the affidavit included assertions pertaining to the agreement between Mr. Johnson and Mr. Tanner, and it agreed with the trial court's holding that Mrs. Tanner lacked the personal knowledge necessary under Rule 56.06 to testify to such matters, and that these statements were inadmissible under the Dead Man's Statute. *Id.* Therefore, the appellate court affirmed

the trial court's ruling on Mrs. Tanner's affidavit.[5]  On the basis of the remaining evidence, the appellate court affirmed the trial court's grant of summary judgment in favor of Mr. Johnson.  *Id.* at *8, 10.  The appellate court also found that the trial court did not err in its initial valuation of Mr. Johnson's option to purchase 5% of Mr. Tanner's billboard business.

In the first appeal, the Court was also called upon to review the trial court's denial of the Appellants' motion to alter or amend, which we considered as a Rule 54.02 motion to revise.[6] The appellate court vacated the denial of this motion because, in its order, the trial court did not explain the reasoning behind its decision.  Specifically, the trial court struck Mrs. Tanner's January 2008 affidavit, which constituted newly submitted evidence.  The appellate court noted that the trial court was obligated to apply the analysis in ***Harris v. Chern***[7] in determining whether to consider the new evidence, and was unable to discern from the record whether it had done so:

> We have reviewed the record and are unable to determine the trial court's reasoning behind the denial of the motion to revise. In its order denying the motion, the trial court states only that "it is not appropriate for the subsequent

---

[5]In the course of its Opinion in the first appeal, the Court uses language that could be interpreted as indicating that the trial court excluded Mrs. Tanner's April 2007 affidavit in its entirety. ***See Johnson***, 2009 WL 3064894, at *8 ("Having determined that Mrs. Tanner's Affidavit was property excluded . . ., and that certain portions of Mr. Johnson's Affidavit are inadmissible, the proof in this case consists of the undisputed Affidavits of Mr. Mendelson, Ms. McGee, Ms. Gregor, and Mr. Peck."). As noted above, however, the trial court did not exclude the April 2007 affidavit in its entirety, but it excluded the portions of it that related to Mr. Tanner's oral agreement with Mr. Johnson and found that the remainder of the affidavit did not create a material factual dispute. The appellate court in the first appeal implicitly acknowledged this by recognizing that most of the statements in the April 2007 affidavit related to the reorganization of Mr. Tanner's billboard business and were not in dispute. ***Id.*** at *7.

[6]The motion to alter or amend was treated as a motion to revise under Rule 54.02, because the order sought to be amended was not a final order. ***Johnson***, 2009 WL 3064894, at *9.

[7]In ***Harris v. Chern***, 33 S.W.3d 741 (Tenn. 2000), the Supreme Court of Tennessee set out the appropriate standard to apply when considering new evidence submitted in support of a Rule 54.02 motion to revise:

> When additional evidence is submitted in support of a Rule 54.02 motion to revise a grant of summary judgment, a trial court should consider, when applicable: 1) the movant's efforts to obtain evidence to respond to the motion for summary judgment; 2) the importance of the newly submitted evidence to the movant's case; 3) the explanation offered by the movant for its failure to offer the newly submitted evidence in its initial response to the motion for summary judgment; 4) the likelihood that the nonmoving party will suffer unfair prejudice; and 5) any other relevant factor.

***Harris***, 33 S.W.3d at 745.

January 11, 2008 affidavit of Pat Tanner and its attachments to be considered as part of the record." The trial court may have considered the second affidavit, thus negating the need for a *Harris* analysis and may have excluded it for reasons similar to the exclusion of Mrs. Tanner's original affidavit. Conversely, the trial court may not have considered the second affidavit, which would create a need for a *Harris* analysis on the record. However, from the trial court's order, it is impossible to know whether either of these scenarios is correct. Consequently, we cannot determine whether the trial court overlooked its obligation under *Harris*, or otherwise abused its discretion. Therefore, we must vacate the trial court's denial of the motion to revise and remand for consideration of, and findings based upon the above cited authorities.

*Id.* Thus, the trial court's denial of the motion to revise was vacated, and the case was remanded to the trial court for further proceedings.

On remand, on October 27, 2009, the trial court entered an amended order on the Tanner defendants' motion to revise, giving its reasons for striking Mrs. Tanner's January 11, 2008 affidavit:

The Court considered this case in great detail. There was obviously a voluminous record in this case, and the Court made findings of fact as part of its Order Granting Plaintiff's Motion for Summary Judgment. After considering the subsequent January 11, 2008 Affidavit of Patricia Tanner and its attachments (collectively "Affidavit"), the Court finds that it should not be part of this record because it does not comply with the personal knowledge requirement of Rule 56.06 of the Tennessee Rules of Civil Procedure and further because it is inadmissible under TCA § 24-1-203, Tennessee's Dead Man's statute. The January 11, 2008, Affidavit of Patricia Tanner is, therefore, stricken from this record. In all other respects, the Motion to Alter or Amend the Summary Judgment Granted to Plaintiff Clarence Johnson on December 13, 2007 is denied.

Because the denial of the Tanner defendants' motion to revise did not dispose of all claims against all parties to this litigation, the trial court certified its order as final pursuant to Rule 54.02. The Appellants appealed this order.

At oral argument in this second appeal, this Court raised the issue of whether the order appealed was final and appealable, despite its certification as final under Rule 54.02.[8] ***See*** Tenn. R. Civ. P. 54.02 ("When more than one claim is present in an action, . . . the Court . . . may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties . . . ."). Therefore, while the appeal was held in abeyance, Mr. Johnson voluntarily dismissed with prejudice his claims against the remaining defendants,[9] and he also withdrew his request for other types of damages not addressed in the order granting summary judgment.[10] Thereafter, the trial court entered an order dismissing these parties and the request for other types of damages. Therefore, an order of final judgment was entered, and was included as a supplemental record in the appeal in this case. We now deem this appeal to be from a final, appealable order.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, the Appellants again seek to challenge the trial court's grant of summary judgment in favor of Mr. Johnson. They argue that the evidence was insufficient to establish either that Mr. Johnson had an oral contract with Mr. Tanner, or to establish the damages for the alleged breach of contract. They claim that the trial court erroneously placed the burden on them to prove that Mr. Johnson was *not* entitled to summary judgment. The Appellants further argue that, in any event, summary judgment should not have been granted against Tanner-Peck, L.L.C., because Mr. Johnson's motion did not seek summary judgment against that entity, and because Tanner-Peck, L.L.C., did not exist at the time the oral agreement was

---

[8]In this case, Mr. Johnson sought damages for breach of his employment agreement against multiple parties, as well as treble damages, punitive damages, costs, and attorney fees, all for the same allegedly wrongful conduct. Thus, the grant of summary judgment was not appropriate for certification as final under Rule 54.02 because it did not dispose of Mr. Johnson's request for treble damages, punitive damages and the like arising out of the same claim. Likewise, the same legal right was asserted against party defendants who were not included in the summary judgment order, in that Mr. Johnson asserted against all defendants the same "aggregate of operative facts which give rise to a right enforceable in the courts." ***Christus Gardens, Inc. v. Baker, Donelson, Bearman***, No. M2007-01104-COA-R3-CV, 2008 WL 3833613, at *5 (Tenn. Ct. App. Aug. 15, 2008) (quoting ***McIntyre v. First Nat'l Bank of Cincinnati***, 585 F.2d 190, 191 (6th Cir. 1978)). Therefore, the summary judgment order, without more, was inappropriate for Rule 54.02 certification. In the alternative, for an order that is not appropriate for certification under Rule 54.02, interlocutory appeal may be sought under Rule 9 of the Tennessee Rules of Appellate Procedure.

[9]Mr. Johnson voluntarily dismissed his claims against defendants Jerry Peck, individually; TOA, Limited; TOA Enterprises, LP; Martin Grusin, Trustee of the Weatherley Tanner Trust; Universal Outdoor, Inc.; WBT Outdoor, Inc.; Tanner Acquisition Corporation; and Tanner Outdoor, LLC.

[10]Specifically, Mr. Johnson withdrew any claims for treble damages, punitive damages, costs and expenses, reasonable attorney fees, and prejudgment interest.

made. The Appellants also challenge the trial court's denial of their Rule 54.02 motion to revise. They argue that the trial court should have granted the motion and (1) deleted Tanner-Peck, L.L.C., as a liable defendant or reduced the damage award against the entity so as to omit any award attributable to amounts earned prior to January 1995 when Tanner-Peck L.L.C., acquired Mr. Tanner's billboard business; (2) adjusted the damage award on Mr. Johnson's 5% ownership interest by using the value of the Universal stock as of January 2, 1997, rather than September 12, 1996; and (3) adjusted the damage award on Mr. Johnson's 5% ownership interest by reducing the sales price by the $21,000,000 in liens paid out of the sale proceeds.

In response, Mr. Johnson contends that the only issue properly before this Court in this appeal is whether the trial court erred in denying the motion to revise and in striking Mrs. Tanner's January 2008 affidavit. Mr. Johnson claims that the Appellants' other arguments are barred by the law of the case doctrine, as those issues were resolved in this Court's first Opinion. He argues that the trial court did not abuse its discretion in striking the January 2008 affidavit based on the personal knowledge requirement of Rule 56.06 or the Dead Man's Statute. He maintains that the trial court likewise did not abuse its discretion in denying the Appellants' motion to revise.

Our first task is to identify the issues remaining for our review. Mr. Johnson correctly notes that, under the law of the case doctrine, we are precluded from revisiting issues that were decided in the first appeal. The Supreme Court has explained the parameters of the law of the case doctrine:

> The phrase "law of the case" refers to a legal doctrine which generally prohibits reconsideration of issues that have already been decided in a prior appeal of the same case. 5 Am. Jur. 2d *Appellate Review* § 605 (1995). In other words, under the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal. *Life & Casualty Ins. Co. v. Jett*, 175 Tenn. 295, 299, 133 S.W.2d 997, 998-99 (1939); *Ladd v. Honda Motor Co., Ltd.*, 939 S.W.2d 83, 90 (Tenn. App. 1996). The doctrine applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication. *Ladd*, 939 S.W.2d at 90 (citing other authority). The doctrine does not apply to dicta. *Ridley v. Haiman*, 164 Tenn. 239, 248-49, 47 S.W.2d 750, 752-53 (1932); *Ladd*, 939 S.W.2d at 90.

*See Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998). As explained in *Memphis Publishing*, the doctrine is not

constitutionally mandated, nor is it a limitation on the court's power, but "it is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited." *Id.* (citing *Ladd*, 939 S.W.2d at 90 (citing other cases)).  The purpose of the rule is to promote "the finality and efficiency of the judicial process, avoid[] indefinite relitigation of the same issue, foster[] consistent results in the same litigation, and assure[] the obedience of lower courts to the decisions of appellate courts." *Id.*  In accordance with this doctrine, we apply the law of the case doctrine to the decisions in the first appeal.[11]

In the first appeal, this Court upheld the trial court's grant of summary judgment in favor of Mr. Johnson, affirming the trial court's holding that the evidence established that Mr. Johnson had a valid employment agreement with Mr. Tanner, as well as the essential terms of that agreement.  *Johnson*, 2009 WL 3064894, at *8.  In the first appeal, the Court also affirmed the trial court's initial determination as to Mr. Johnson's damages based on the evidence that was before the trial court at the time it entered the order granting summary judgment.  The appellate court did not review the trial court's denial of the Tanner defendants' motion to revise, because the trial court did not adequately explain its decision to strike the newly submitted January 2008 affidavit of Mrs. Tanner, and so vacated the denial of the motion and remanded for further consideration.

Applying the law of the case doctrine at this point, we conclude that we are precluded in this second appeal from reviewing the correctness of the trial court's grant of summary judgment in favor of Mr. Johnson on liability or the trial court's initial calculation of damages based on the evidence presented at that juncture.  Remaining for review are all issues raised by the Appellants' motion to revise the trial court's summary judgment order.  One issue in the motion relates to the propriety of the trial court's decision to strike Mrs. Tanner's January 2008 affidavit.  However, because this Court declined in the first appeal to consider the substantive issues related to the motion to revise, our review in this appeal is not limited to the decision to strike the January 2008 affidavit.

A trial court's ruling on a Rule 54.02 motion to revise is reviewed for an abuse of discretion. *Harris*, 33 S.W.3d at 746 (citing *Donnelly v. Walter*, 959 S.W.2d 166, 168 (Tenn. Ct. App. 1997)).  "Discretionary decisions must take the applicable law and relevant facts into account." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524-25 (Tenn. 2010).  A trial court abuses its discretion when it (1) applies an incorrect legal standard; (2) reaches an illogical or unreasonable decision; or (3) bases its decision on a clearly erroneous assessment of the

---

[11]Certain limited circumstances may justify reconsideration of an issue that has been decided in a prior appeal. *See Memphis Publ'g Co.*, 975 S.W.2d at 306.  None of those circumstances has been asserted on appeal, nor do we find any circumstances that warrant reconsideration of our prior decision in this case.

evidence. ***Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.***, 249 S.W.3d 346, 348 (Tenn. 2008). A trial court's discretionary decision must be scrutinized to determine "(1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions." ***Beecher***, 312 S.W.3d at 524 (citing ***Flautt & Mann v. Council of Memphis***, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008)). When reviewing a discretionary decision, the trial court's findings of fact are reviewed *de novo*, and they are presumed correct unless the preponderance of the evidence is otherwise. ***Id.*** at 525. The trial court's legal conclusions, however, are reviewed *de novo* with no presumption of correctness. ***Id.***

## ANALYSIS

The Appellants raised several issues in their motion to revise, all of which they ask this Court to review on appeal. In the motion, the Appellants assert that the trial court should have:

> 1. Reversed the grant of summary judgment as against Tanner-Peck, L.L.C., because Mr. Johnson made no allegation that this entity entered into an agreement with him, and his motion for summary judgment was not filed against this entity specifically; in addition, Tanner-Peck, L.L.C., did not exist when the contract was made in 1992, but was formed in 1994 and acquired the assets and assumed the obligations of Mr. Tanner's business in 1995;
> 2. Alternatively, reduced the amount of damages awarded against Tanner-Peck, L.L.C., by any amounts that accrued prior to the formation of the entity;
> 3. Reduced the amount of damages awarded to Mr. Johnson to reflect (a) the price of Universal stock as of January 2, 1997, the day of the closing of the sale, rather than the price of Universal stock in September 1996; and (b) the $21,000,000 payment to First Tennessee Bank out of the proceeds of the sale.

In the first appeal, the appellate court vacated the trial court's denial of the motion to revise because it did not explain why Mrs. Tanner's January 2008 affidavit was struck, and the cause was remanded for that reason. Therefore, at the outset, we review the trial court's decision to strike the affidavit, and then consider the other issues arising out of the motion to revise.

### *January 2008 Affidavit by Mrs. Tanner*

As noted in the first appeal, the January 2008 affidavit by Mrs. Tanner is constituted newly submitted evidence. ***Johnson***, 2009 WL 3064894, at *9 (citing ***Harris***, 33 S.W.3d at 746).

Under *Harris*, the trial court is to consider the movant's efforts to obtain evidence to respond to the summary judgment motion, the importance of the evidence to the movant's case, the movant's explanation for failing to submit the evidence in its response to the summary judgment motion, and the likelihood of unfair prejudice to the nonmovant. *Harris*, 33 S.W.3d at 746.

Here, the trial court did not state that it decided to strike the January 2008 affidavit because the Appellants could have offered it with their initial response to the summary judgment motion,[12] or because of unfair prejudice to Mr. Johnson.[13] We presume, then, that the trial court did not find that the *Harris v. Chern* factors precluded the consideration of the January 2008 affidavit. Instead, the trial court explained that it struck the January 2008 affidavit from the record because it did "not comply with the personal knowledge requirement" and that it was "inadmissible under . . . Tennessee's Dead Man's statute." (Vol. 1 at 2.) We consider these reasons in turn.

As noted by the trial court, Rule 56.06 requires that affidavits be made on personal knowledge:

> 56.06. Form of Affidavits-Further Testimony-Defense Required .-Supporting and opposing affidavits shall be made on personal knowledge, such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but his or her response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party....

Tenn R. Civ. P. 56.06. In the portions of Mrs. Tanner's April 2007 affidavit that were not deemed inadmissible by the trial court, she stated that, from 1992 forward, she worked daily

---

[12]In fact, a substantial part of Mrs. Tanner's January 2008 affidavit repeats, and elaborates on, the statements in the April 2007 affidavit that "relate to the reorganization of Mr. Tanner's billboard business" on facts that "are not in dispute." *Johnson*, 2009 WL 3064894, at *7.

[13]As noted above, Mr. Johnson did not object to Mrs. Tanner's January 2008 affidavit.

in the Tanner billboard business, first under the trade name Tanner-Peck Outdoor and then later after the Tanner billboard business was transferred to Tanner-Peck, L.L.C.[14] She recounted that Tanner-Peck, L.L.C., operated the Tanner billboard business until the billboard assets were sold to Universal in January 1997.

In the January 2008 affidavit, Mrs. Tanner states that when Tanner-Peck, L.L.C., was formed in November 1994, she became its Secretary. The bulk of the remainder of Mrs. Tanner's January 2008 affidavit relates to the reorganization of Tanner-Peck Outdoor, its transfer to Tanner-Peck, L.L.C., and the terms of the sale of the assets of the Tanner billboard business to Universal. To a great extent, the statements simply provide authentication for the documents attached to the affidavit, along with limited context that largely paraphrases the language in the documents. As in her April 2007 affidavit, many of the facts regarding the business entities are not in dispute, and the authenticity of the documents attached to the affidavit are not in question. *See Johnson*, 2009 WL 3064894, at *7.

According to the statements in her affidavit, Mrs. Tanner's personal knowledge about these documents and the business transactions arises out of her position as an officer in the billboard business. We note as well that the statements in the April 2007 affidavit deemed inadmissible for lack of personal knowledge, such as her denial that Mr. Tanner ever agreed that Mr. Johnson could purchase a 5% ownership interest in the Tanner billboard business, were not included in Mrs. Tanner's January 2008 affidavit. As it is undisputed in the record that Mrs. Tanner worked as an officer in the Tanner billboard business at all relevant times, we must find that Mrs. Tanner had the personal knowledge necessary to make the statements in the January 2008 affidavit regarding business details and to authenticate the documents attached to the affidavit, which relate to the sale of the Tanner billboard business to Universal. Therefore, we find that the trial court erred in concluding that the January 2008 affidavit did not satisfy the personal knowledge requirement of Rule 56.06.

Under Tennessee's Dead Man's Statute, interested parties cannot testify about conversations or transactions with the deceased when that testimony involves transactions or statements that would either increase or decrease the deceased's estate. *See id.* The statute provides:

> In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party. If a corporation is a party, this disqualification shall extend to its officers of every grade and its directors.

---

[14]This fact was corroborated by Mr. Johnson in his deposition.

T.C.A. § 24-1-203 (2000). The Dead Man's statute was the other basis for the trial court's decision to strike Mrs. Tanner's January 2008 affidavit.

We must respectfully disagree with the trial court's decision on this basis as well. Unlike Mrs. Tanner's April 2007 affidavit, in which she testified about transactions and statements involving her deceased husband's communications with Mr. Johnson, Mrs. Tanner's January 2008 affidavit relates solely to the reorganization and transfer of the billboard business to Tanner-Peck, L.L.C., and the terms of the sale of its assets to Universal. *See id.* In light of this finding, we must conclude that the trial court erred in striking Mrs. Tanner's affidavit on the basis that it violates the Dead Man's statute.[15] Accordingly, we must find that the trial court erred in declining to consider Mrs. Tanner's January 2008 affidavit in connection with the Appellants' motion to revise the order granting of summary judgment.

### Tanner-Peck, L.L.C.

The Appellants next argue that the trial court erred in refusing to revise its summary judgment order to delete Tanner-Peck, L.L.C., as a liable defendant. The Appellants point out that Mr. Johnson's motion for summary judgment did not allege that Tanner-Peck, L.L.C., was involved in the oral agreement between Mr. Tanner and Mr. Johnson. Mr. Johnson asserted in the summary judgment motion that his cause of action arose out of "an employment contract entered into by Johnson and William B. Tanner," and requested that the trial court "enter summary judgment for the Plaintiff," without specifying any particular defendant. In addition, the Appellants claim, none of the evidence submitted by Mr. Johnson in support of his motion for summary judgment established that Tanner-Peck, L.L.C., was liable to Mr. Johnson under the oral agreement. The Appellants maintain that the burden was on Mr. Johnson to show that a contract with the limited liability company existed; the burden was not on Tanner-Peck, L.L.C., to show that a contract did *not* exist.

Moreover, the Appellants insist that Tanner-Peck, L.L.C., cannot be held liable for the breach of a 1992 oral agreement when Tanner-Peck, L.L.C., had not even been formed at that time. The entity was formed in November 1994, and the Tanner billboard business was transferred to Tanner-Peck, L.L.C., in January 1995. The Appellants assert that "Tanner-Peck, LLC only assumed remuneration sums due Johnson, as an at-will employee, after January 1995, and only so long as Johnson's employment continued." Under these circumstances, the Appellants argue, the trial court should have revised its order granting summary judgment to delete any judgment against Tanner-Peck, L.L.C.

---

[15]Similarly, the January 2008 affidavit does not include the type of statements that were in the April 2007 affidavit that the trial court described as "conclusory," such as Mrs. Tanner's assertion that Mr. Johnson had been paid all sums he was due.

Mr. Johnson's counsel says little in response. He does not dispute the underlying facts, but merely offers the following conclusory assertion: "If the Chancery Court's judgment is correct in other respects, there is no doubt that Mr. Johnson is entitled to summary judgment against Tanner-Peck, L.L.C."[16] Mr. Johnson's counsel cites no legal or evidentiary authority to support his position.

The record reflects that the motion for summary judgment filed by Mr. Johnson did not seek summary judgment against any particular defendant; it merely requested that summary judgment be entered in favor of Mr. Johnson. The trial court, and this Court, is left to speculate about whether Mr. Johnson was seeking summary judgment against a particular defendant or against all defendants. In a similar vein, the motion for summary judgment and the supporting affidavits contain no alleged facts or specifics as to any of the multiple entities named in the complaint. The affidavits of Mr. Johnson and his other affiants include detailed allegations on encounters and dealings with Mr. Tanner, but no information as to any other defendant.[17] As to Tanner-Peck, L.L.C., the evidence supporting Mr. Johnson's summary

_____

[16]Mr. Johnson did not refer to this argument in his appellate brief filed in this second appeal. To find this reference, we reviewed the arguments made in his brief filed in connection with the first appeal, which was included in this appellate record for our consideration.

[17]Mr. Johnson candidly acknowledged in his deposition that he had no information about the defendant entities, such as Tanner-Peck, L.L.C. After Mr. Johnson stated in his deposition that he was seeking damages for "denial for me to exercise my option to purchase up to 5 percent of the company," the following exchange occurred:

> Q: And when you say "5 percent of the company," you're saying 5 percent of Tanner-Peck, L.L.C.?
>
> A: No, I'm saying 5 percent of the company, and I'm saying 5 percent of the company as represented by the web of tangled companies that made up that corporation and/or LLC and/or d/b/a or whatever it was that Bill Tanner created that was known as Tanner-Peck Outdoor.

When later asked why he sued entities of which he had little knowledge, Mr. Johnson explained:

> A: The answer to that is very simple, Mr. Norcross, there were a lot of entities . . . that William B. Tanner was involved in. He made a very, very excellent shadow game, if you will, of having entities and assets and companies. . . . I have no idea where the companies were, what had what, what the assets were. . . .
>
> So rather than sue William B. Tanner individually for his personal face-to-face wrongdoing that he did to me over those years, I don't know – my checks came from Tanner-Peck Outdoor, then my checks came from Tanner-Peck, L.L.C.

(continued...)

judgment motion asserted no specific facts upon which it could be concluded that Tanner-Peck, L.L.C., formed after Mr. Tanner and Mr. Johnson entered into the oral agreement, assumed the responsibilities owed by Mr. Tanner and/or Tanner Outdoor.[18]   Instead, the focus of Mr. Johnson's summary judgment motion was on establishing an oral agreement between him and Mr. Tanner and the terms of that agreement.

From the record, the basis for entry of summary judgment against the Representative of the Estate of William B. Tanner is clear.  In 1992, when Mr. Johnson and Mr. Tanner entered into the alleged oral agreement, Mr. Tanner's billboard business was operated as a sole proprietorship, d/b/a either Tanner Outdoor or Tanner-Peck Outdoor.  Mr. Johnson asserted that he attempted to exercise his option to purchase 5% of the business in April 1993 and was rebuffed by Mr. Tanner at that time.  Mr. Johnson's expert on damages, Robert Vance, calculated Mr. Johnson's buy-in cost as of April 1993.  So Mr. Johnson's factual allegations support an entry of summary judgment against Mr. Tanner individually or, after his death, against the representative of his estate.  At the hearing on Mr. Johnson's summary judgment motion, as in the written motion, his counsel focused on the factual allegations on the agreement with Mr. Tanner.

It is not clear in the record how summary judgment came to be entered against Tanner-Peck, L.L.C.[19]  The only facts in evidence at the time the summary judgment motion was heard

---

[17](...continued)
* * *
   All I know is that no matter what the company entity was, it was all funneled down into William B. Tanner.  He was all of those companies.

[18]Mr. Johnson conceded that he had no option to purchase an ownership interest in Tanner-Peck, L.L.C.:

  Q: And did Tanner-Peck, L.L.C. ever grant you any options of any kind?

  A: You're asking me if Tanner-Peck, L.L.C. like it's a human being.  It is not.

  Q: It is an entity.

  A: Okay.  Then Tanner-Peck or Tanner-Peck, L.L.C. was Bill Tanner in my mind. . . .

  Q: Bill Tanner did, but I'm not asking you about Bill Tanner. . . .  Did Tanner-Peck, L.L.C. grant you any options to purchase any interest in limited liability membership in it?

  A: No.

[19]At the hearing, counsel for the Tanner defendants noted that Tanner-Peck, L.L.C., did not come into
(continued...)

consisted of Mr. Johnson's deposition testimony that, after January 1995, his compensation came from Tanner-Peck, L.L.C., and Mrs. Tanner's April 2007 affidavit testimony that, as part of Mr. Tanner's reorganization of his billboard business, "Tanner's Billboard Business was transferred to Tanner-Peck, L.L.C." The order granting summary judgment appears to essentially consider Mr. Tanner, Tanner Outdoor, and Tanner-Peck, L.L.C., as one and the same. After noting that Mr. Tanner hired Mr. Johnson in 1992 to work at "Tanner-Peck Outdoor," the order states that the contracting business entity would be referred to as "Tanner-Peck Outdoor or Tanner-Peck for consistency and clarity, even though the business was transferred to Tanner-Peck, LLC in 1995." The only other mention in the order of Tanner-Peck, L.L.C., comes in the grant of summary judgment against "the Estate of William B. Tanner, Tanner-Peck, L.L.C., and its successor company Tanner Investment Company, LLC." The orders denying the Appellants' motion to revise do not address the specific issue of whether sufficient evidence was submitted to show that the obligations under the oral agreement with Mr. Johnson were assumed by Tanner-Peck, L.L.C., after the 1995 transfer of Mr. Tanner's business. The January 2008 affidavit of Mrs. Tanner, filed by Appellants in support of the motion to revise, attaches a 1995 financial statement for Tanner-Peck, L.L.C., that states that the L.L.C. was organized on January 12, 1995, and, prior to that, "the entity conducted business as Tanner-Peck Outdoor Sign." The financial statement indicates that the LLC acquired some assets of Tanner-Peck Outdoor Sign but not others. Liabilities and debts are included in the statement, without indicating whether they were transferred from Tanner-Peck Outdoor Sign. Employee-related obligations, such as contracts, are not mentioned in the statement. Mrs. Tanner's January 2008 affidavit also attaches portions of the asset purchase agreement with Universal, which does not mention employee contracts.

---

[19](...continued)
existence until 1994. After that, the following exchange occurred:

> THE COURT: Yes, Sir. Thank you. What about the question of what entities you're talking about?

> MR. SMITH [counsel for Johnson]: Well, they didn't raise it in their brief. So if they are, I would like an opportunity to address it, to brief it. It's just not raised.

> THE COURT: I mean, I didn't remember seeing it.

> MR. NORCROSS [counsel for Tanner defendants]: I thought we had, Your Honor.

> THE COURT: I don't remember seeing it.

> MR. SMITH: I don't think it was briefed or raised.

> THE COURT: Well, we are not going to raise it now then if it's not in the brief.

A plaintiff seeking summary judgment on the merits of his complaint is charged with the burden of showing that "there is no genuine issue as to any material fact," and that he is "entitled to a judgment as a matter of law." *See Hannan v. Alltell Pub'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008). He has the affirmative duty to put forth sufficient evidence to establish the elements of his claim in order to shift the burden of production to the Appellants, specifically Tanner-Peck, L.L.C. *Johnson*, 2009 WL 3064894, at *4-5.

> In Tennessee, a limited liability company exists separate and apart from its members: This Court has warned that, because "a corporation is presumptively treated as a distinct entity," a corporations's identity should be disregarded only "with great caution and not precipitately." *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991); *see also Widdicombe v. McGuire*, 429 S.W.2d 815, 817-18 (Tenn. 1968). Likewise, "[a] limited liability company is a form of legal entity that has the attributes of both a corporation and a partnership but is not formally characterized as either one." 83 Am. Jur. 2d Limited Liability Companies § 1 (footnotes omitted). Moreover, "*[a] limited liability company has an existence separate from its members and managers* ... [and] may only appear in court through counsel." *Id.* (footnotes omitted).

*Collier v. Greenbrier Developers, LLC*, No. E2008-01601-COA-R3-CV, 2009 WL 1026025, at *4 (Tenn. Ct. App. Apr. 16, 2009) (emphasis added). The *Collier* court stated that it could not hold that a sole member of a limited liability company "is, *ipso facto*, in privity with the LLC." *Id.* Therefore, Tanner-Peck, L.L.C., is an entity which is separate and apart from Mr. Tanner, as a member of the L.L.C.

Moreover, Tennessee recognizes the traditional rule that "when one company transfers some or all of its assets to another company the successor is not liable for the debts of the predecessor" except under certain enumerated circumstances.[20] *Hopewell Baptist Church*

---

[20]Under the traditional rule, the circumstances under which a successor corporation may be held liable for the debts of the predecessor are:

> (1) The purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape liability for such debts. . . . A fifth exception, sometimes incorporated . . ., is the absence of adequate consideration for the sale or transfer.

*Hopewell Baptist Church v. Southeast Window Mfg. Co., LLC*, E2000-02699-COA-R3-CV, 2001 WL 708850, at *4 (Tenn. Ct. App. June 25, 2001) (quoting *Bonee v. L & M Constr. Chem.*, 518 F.Supp. 375

(continued...)

***v. Southeast Window Mfg. Co., LLC***, No. E2000-02699-COA-R3-CV, 2001 WL 708850, at *4 (Tenn. Ct. App. June 25, 2001) (quoting with approval ***Bonee v. L & M Constr. Chem.***, 518 F. Supp. 375 (M.D. Tenn. 1981)); ***see Gas Plus of Anderson County, Inc. v. Arowood***, No. 03A01-9311-CH-00406, 1994 WL 465797 (Tenn. Ct. App. Aug. 30, 1994); George W. Kuney, *Successor Liability in Tennessee*, 43 TENN. BAR J. 24 (May 2007); ***see also*** 19 AM. JUR. 2D *Corporations* § 2319 (2010) ("Subject to a number of exceptions, . . . the general rule is that . . . liability of a new corporation for the debts of another corporation does not result from the mere fact that the former is organized to succeed the latter."). In ***Hopewell Baptist***, the plaintiff purchased windows from Huskey Aluminum, Inc., and the windows proved defective. ***Id.*** at *1. After the windows were installed, Southeast LLC came into existence and purchased certain assets of Huskey and assumed certain liabilities. ***Id.*** The plaintiff sued both Huskey and Southeast LLC on the warranty for the windows. The trial court found that Southeast LLC was a successor corporation to Huskey and had expressly or impliedly assumed Huskey's obligation under the window warranty. ***Id.*** at *4. Southeast LLC appealed. The appellate court reversed, finding insufficient evidence to support the trial court's conclusion that Southeast LLC assumed Huskey's warranty obligations. ***Id.*** at *5.

In the case at bar, Mr. Johnson submitted essentially no evidence regarding Tanner-Peck, L.L.C.,[21] or the transfer of Mr. Tanner's billboard business from his sole proprietorship to Tanner-Peck, L.L.C. Certainly the evidence was insufficient to establish as a matter of law that Tanner-Peck, L.L.C. should be held liable for the obligations of Mr. Tanner or his sole proprietorship to Mr. Johnson, and insufficient to shift the burden of production to Appellant Tanner-Peck, L.L.C. ***Johnson***, 2009 WL 3064894, agt *4-5.

Consequently, we must conclude that the trial court abused its discretion in denying the Appellants' motion to revise the order granting summary judgment as to Tanner-Peck, L.L.C. The summary judgment order is therefore reversed as to Tanner-Peck, L.L.C.

### *Damages*

The only component of the trial court's damage award that the Appellants challenged in the motion to revise was the award to Mr. Johnson of $3,383,000 "for not being allowed to

---

[20](...continued)
(M.D. Tenn. 1981)).

[21]For that matter, Mr. Johnson submitted no evidence as to the liability of any of the defendant entities, only evidence as to the liability of Mr. Tanner and his sole proprietorship.

exercise his five percent (5%) purchase option."[22]  An explanation of how the trial court arrived at this figure is helpful to an understanding of the Appellants' arguments on appeal.

As noted above, Mr. Johnson submitted evidence that, in 1992, he and Mr. Tanner entered into an oral employment agreement that included an option for Mr. Johnson to purchase 5% of Mr. Tanner's billboard company.  In April 1993, Mr. Johnson attempted to exercise his option, but Mr. Tanner rebuffed his attempt.  This action constituted a breach by Mr. Tanner of the oral employment agreement.  As damages for this breach, Mr. Johnson asserted that he was entitled to 5% of the proceeds from the 1997 sale of the Tanner-Peck, L.L.C. assets to Universal, less what it would have cost him in 1993 to "buy in."  To establish these damages, Mr. Johnson submitted the affidavit of Certified Public Accountant Robert Vance ("Mr. Vance"), who performed the calculations necessary to determine the appropriate amount of damages.  Mr. Vance determined that the fair value of 5% equity in the billboard company in April 1993 was $322,000.  He used this amount as the "exercise price," or the price Mr. Johnson would have paid in April 1993 to buy 5% of the billboard business.  *See Johnson*, 2009 WL 3064894, at *7.  Mr. Vance then used a sales price to Universal of $74,100,000, a figure which was apparently provided to him by Mr. Johnson.  Subtracting the exercise price ($322,000) from 5% of the sales price ($3,705,000), Mr. Vance arrived at a damage amount of $3,383,000.

In awarding Mr. Johnson the amount of damages calculated by Mr. Vance, the trial court noted that, although the Appellants did not challenge Mr. Vance's specific calculations, they disputed the amount of the damages by submitting Mrs. Tanner's April 2007 affidavit.  In that affidavit, Mrs. Tanner claimed that the sales price of Tanner-Peck, L.L.C., to Universal was not a total of $74,100,000; rather, it was $70,880,000 plus 100,000 shares of Universal stock.  In evaluating whether Mrs. Tanner's April 2007 affidavit created a genuine issue of material fact, the trial court took judicial notice that the Universal stock was worth $3,280,000, or $32.75 per share, on September 12, 1996, which was "the date prior to the announced date of sale."  The trial court then concluded that "[i]f the value of the shares is added to the cash price supplied by Patricia Tanner, the total is $74,100,000, the amount supplied by Johnson."  Therefore, because the sales price supplied by Mr. Johnson and Mrs. Tanner did not conflict, the trial court found, there was no genuine issue of material fact as to the amount of damages as calculated by Mr. Vance. Consequently, relying on Mr. Vance's calculations, the trial court found that Mr. Johnson's damages for breach of the agreement to permit him to purchase 5% of the business in April 1993 amounted to $3,383,000.

---

[22]The Appellants did not challenge the trial court's awards of $852,000 in commissions or $120,450 in profit overrides in their motion to revise.

In their motion to revise, the Appellants asserted that the trial court erred in using the $74,100,000 figure supplied by Johnson. The Appellants argue that the correct sales price was $70,880,000 plus 100,000 shares of Universal stock, and that the stock component of the sales price should have been valued by using the trading price of the stock as of January 2, 1997, rather than September 12, 1996. They also argued that the trial court erred in declining to subtract the $21,000,000 paid to First Tennessee Bank in determining the net sales proceeds for purposes of Mr. Johnson's damages. We will address these issues in turn.

## A. The Universal Stock Value

On appeal, the Appellants again argue that the trial court erred in refusing to revise the damages award to Mr. Johnson to value the Universal stock as of January 2, 1997, rather than September 12, 1996. The Appellants argue that using the January 2, 1997 value of the Universal stock more accurately represents the actual proceeds realized from the sale.

In support of their argument, the Appellants submitted the January 2008 affidavit of Mrs. Tanner, in which she stated in pertinent part:

> 12. On or about September 12, 1996, Tanner-Peck, LLC, TOA Enterprises, L.P., William B. Tanner, WBT Outdoor, Inc., Weatherley Tanner Trust, Tanner Acquisition Corporation, and Universal Outdoor, Inc. ("Universal"), entered into an Option and Asset Purchase Agreement (the "Universal Option Agreement"), by which Universal Outdoor, Inc. was granted an option, as of September 12, 1996, to purchase the Tanner Outdoor Assets upon the terms and conditions set forth in the Universal Option Agreement, which contains 64 pages.
> ...
> 15. Pursuant to the terms of the Universal Option Agreement, Universal was under no obligation to purchase the Tanner Outdoor Assets on September 12, 1996.
> 16. The transactions, the subject of the Universal Option Agreement, were closed on January 2, 1997 (the "January 2, 1997 Closing").
> ...
> 20. The January 2, 1997 Tanner-Peck, LLC Balance Sheet reflects the value of the 100,000 shares of Universal stock at $2,306,250.00 on January 2, 1997.
> 21. The cash purchase price set forth in paragraph 24 of my April 30, 2007 Affidavit [$70,880,000] sets forth the estimated gross amount ("less closing adjustments") paid by Universal and was the approximate gross amount received by Tanner-Peck, LLC and TOA Enterprises, LP.

Thus, Mrs. Tanner asserted that the Option Agreement was executed in September 1996, and Universal received an option to buy the assets on that date, but that the closing on the sale of the assets occurred on January 2, 1997. She recited the value of the Universal stock on January 2, 1997, and the gross amount paid by Universal for the assets. Attached to Mrs. Tanner's affidavit were, *inter alia*, portions of the Universal Option Agreement as well as the Tanner-Peck, L.L.C. Consolidated Balance Sheet dated January 2, 1997. The Universal Option Agreement states that the sales price to Universal was, indeed, $70,880,000 plus 100,000 shares of Universal stock. The January 2, 1997 Balance Sheet reflects that the Universal Outdoor stock on that date, the date of the closing, was valued at $23.0625 per share, or $2,306,250 for 100 shares.

In the trial court below, Mr. Johnson's claimed damage figures were submitted through the expert testimony of CPA Robert Vance, including the damages for the refusal to permit Mr. Johnson to buy 5% of Tanner's billboard company. However, for some reason, Mr. Johnson's counsel did not include Mr. Vance's testimony, or the documents on which he relied, in the appellate record.

Nevertheless, the trial court's order granting summary judgment to Mr. Johnson states that the $74,100,000.00 figure for the proceeds of the asset sale to Universal was not the result of Mr. Vance's calculation from source documents; rather, Mr. Johnson "supplied this number [$74,100,000.00] to Robert Vance who used it to calculate Johnson's damages related to the five percent (5%) option." The appellate record gives this Court no indication of how Mr. Johnson arrived at this figure. More importantly, the appellate record contains no basis to conclude that Mr. Johnson had any personal knowledge of the proceeds realized from the sale to Universal. Quite the opposite; our review of Mr. Johnson's deposition and affidavit testimony indicates that he was *not* involved in the Universal sale or any of Mr. Tanner's alleged "shadow game . . . of having entities and assets and companies." *See* n. 18, *supra*. Based on the record before us, we find no evidentiary basis for utilizing the $74,100,000.00 figure supplied by Mr. Johnson to calculate his damages related to his 5% ownership interest, and the figures in Mrs. Tanner's January 2008 affidavit thus stand unrefuted.

Damages for breach of an employment agreement are compensatory in nature and should equal the amount that the employee would have received under the contract had the contract had not been breached. *See Lamons v. Chamberlain*, 909 S.W.2d 795, 801 (Tenn. Ct. App. 1993); *Hennessee v. Wood Group Enters., Inc.*, 816 S.W.2d 35, 37 (Tenn. Ct. App.1991); *Wilhite v. Brownsville Concrete Co.*, 798 S.W.2d 772, 774 (Tenn. Ct. App. 1990).

Sections 1.3(a) and (b) of the Universal Option Agreement provide that consideration for the agreement consisted of a non-refundable "Option Payment" of $5,000,000, due on the date

the agreement was made, and $65,880,000 plus 100,000 shares of Universal stock that would be due if the option to purchase were exercised.[23]

We find no basis in the record for utilizing the September 1996 value of the Universal stock for purposes of calculating Mr. Johnson's damages. On the undisputed facts set forth in the January 2008 affidavit of Mrs. Tanner, the trading price of the Universal stock on the date of the closing more accurately reflects the proceeds realized from the sale of the Tanner billboard business to Universal. The January 2, 1997 Tanner-Peck, L.L.C. Balance Sheet lists as an asset to the company the "Universal Outdoor-Inc. Stock," and it values that stock as $2,306,250, which equals the value of 100,000 shares at $23.0625 per share. This indicates that the proceeds from the sale to Universal totaled $73,186,250, and Mr. Johnson would be entitled to 5% of this amount, less the exercise price. Based on this evidence, we must conclude that the trial court abused its discretion by refusing to revise the order granting summary judgment as requested by the Appellants in this regard. We must remand the cause to the trial court to recalculate Mr. Johnson's damages in a manner consistent with this Opinion.

### B. Failure to Reduce Sales Price by $21,000,000 Debt

Finally, the Appellants argue that the trial court erred in declining to revise the summary judgment order by reducing Mr. Johnson's damages in a manner that took into account the $21,000,000 paid to First Tennessee Bank out of the Universal sales proceeds. In declining to do so, they claim, the trial court disregarded the fact that the assets transferred to Universal were subject to a substantial amount of debt, which resulted in Mr. Johnson being awarded damages based on the *gross* sales proceeds rather than the *net* proceeds. In support, the Appellants again rely on Mrs. Tanner's January 2008 affidavit, which stated that the billboard business assets "were subject to liens securing approximately $21,000,000 owed to First Tennessee Bank," and that "First Tennessee Bank was paid . . . from the cash proceeds received from Universal at the January 2, 1997 closing."

As noted above, we find that Mrs. Tanner's January 2008 affidavit should have been considered by the trial court in adjudicating the Appellants' motion to revise. Regardless of Mrs. Tanner's affidavit, however, the statements upon which the Appellants rely are facts that are not in dispute. In the first appeal in this case, the Court noted that, "[a]t the time of the January 2, 1997 closing, the assets comprising Mr. Tanner's billboard business were subject to liens securing approximately $21,000,000 in debt held by First Tennessee Bank,"

---

[23]The agreement actually provides that the case price would be $65,885,000 if the sale were closed after January 1, 1997. Neither party has asserted that this figure was used in the actual sale.

and that at the closing, "First Tennessee Bank was paid the amount of the debt from the cash proceeds received from Universal." *Johnson*, 2009 WL 3064894, at *1.

Thus, the sales price to Universal included a cash payment of $70,880,000, out of which the Tanner companies' $21,000,000 debt was paid. Therefore, the Tanner companies *actually* received only $49,880,000 in cash proceeds from the sale, rather than the entire $70,880,000. Had Mr. Johnson been permitted in April 1993 to purchase 5% of the Tanner company as was agreed, he would have been proportionately liable for the debt to First Tennessee Bank, and he would have received 5% of the *net* proceeds, not the *gross* proceeds. For this reason, we must conclude that the trial court abused its discretion by declining to revise the damage award to take into account the $21,000,000 debt to First Tennessee Bank. We remand this issue to the trial court for recalculation of the damages related to Mr. Johnson's 5% option, reducing the sales price component by the debt paid to First Tennessee Bank out of the sales proceeds.

### CONCLUSION

We decline to review the trial court's grant of summary judgment in favor of Mr. Johnson based on the law of the case doctrine, and so the initial grant of summary judgment to Mr. Johnson remains affirmed from the first appeal. We reverse the trial court's decision to deny the Appellants' motion to revise the summary judgment order to delete Tanner-Peck, L.L.C., as a liable defendant. We also reverse the trial court's decision to strike Mrs. Tanner's January 2008 affidavit and find that the affidavit should have been considered in determining whether to grant the motion to revise. In addition, we reverse the denial of the motion to revise insofar as the trial court should have calculated Mr. Johnson's damages by using the Universal stock price as of January 2, 1997, and should have reduced the sales price by the approximately $21,000,000 debt paid to First Tennessee Bank out of the sales proceeds. We remand the case to the trial court for recalculation of the damages based on these holdings. All other issues raised on appeal are pretermitted.

The decision of the trial court is affirmed in part and reversed in part, and the cause is remanded for proceedings consistent with this Opinion. Costs on appeal are to be taxed to Appellee Clarence E. Johnson, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

-26-